**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**CINDY L. LOONEY O/B/O
MICHAEL ALLEN LOONEY,**

       **Plaintiff,**

**vs.**                                                                 **CIVIL ACTION NO. 2:16-02052**

**CAROLYN W. COLVIN
ACTING COMMISSIONER OF
SOCIAL SECURITY,**

       **Defendant.**

**<u>PROPOSED FINDINGS AND RECOMMENDATION</u>**

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. By Order entered March 4, 2016 (Document No. 3.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross-Motions for Judgment on the Pleadings. (Document Nos. 8 and 9.)

The Plaintiff, Cindy L. Looney (hereinafter referred to as "Mrs. Looney"), on behalf of her husband, Michael Allen Looney (hereinafter referred to as "Claimant"), is a substitute party in this matter since his death.[1] Claimant protectively filed his application for Title II benefits on March 21, 2013, alleging disability since November 1, 2011[2] due to major depression, anxiety, bipolar,

---

[1] The Notice Regarding Substitution of Party Upon Death of Claimant was filed on September 2, 2014. (Tr. at 146.)

[2] The Field Office Report indicated an alleged onset date of January 1, 1962. (Tr. at 184.)

high blood pressure, high cholesterol, and diabetes.[3] (Tr. at 159, 165, 188.) His claim was denied on April 22, 2013 (Tr. at 93-97.) and again upon reconsideration on September 11, 2013. (Tr. at 102-108.) Thereafter, Claimant filed a written request for hearing on October 9, 2013. (Tr. at 109-110.) By letter dated September 5, 2014, Mrs. Looney amended the alleged onset date to February 17, 2014. (Tr. at 13, 178.) An administrative hearing was held on October 9, 2014 before Administrative Law Judge ("ALJ") John T. Molleur. (Tr. at 30-64.) The ALJ heard the testimonies of Mrs. Looney (Tr. at 38-59.) and Vocational Expert ("VE") Nancy Shapero. (Tr. at 59-63.) On October 23, 2014, the ALJ entered a decision finding Claimant was disabled as of February 18, 2014. (Tr. at 13-29.)

The ALJ's decision became the final decision of the Commissioner on January 12, 2016 when the Appeals Council denied Claimant's Request for Review. (Tr. at 1-6.) On March 3, 2016, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 1.)

Standard

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

---

[3] In his Disability Report – Appeal, dated October 9, 2013, Claimant alleged that since September 2013, he had "increased depression and anxiety" and "[d]ifficulty being out in public – [t]rouble concentrating and staying on task." (Tr. at 225.)

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(g), 416.920(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental

impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
>
> (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.
>
> (4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work

activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[4] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's RFC. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4) and 416.920a(e)(4).

In this particular case, the ALJ determined that Claimant last met the requirements for insured worker status through December 31, 2017. (Tr. at 15, Finding No. 1.) Moreover, the ALJ

---

[4] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since the alleged onset date. (Id., Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from the following severe impairments since the alleged onset date of disability, February 17, 2012: bipolar disorder, diabetes, and anxiety. (Tr. at 16, Finding No. 3.) Beginning on the established onset date of disability, February 18, 2014, the ALJ found that Claimant had the following severe impairments: bipolar disorder, diabetes, anxiety, and carpal tunnel syndrome. (Id.) At the third inquiry, the ALJ concluded that since the alleged onset date of disability, February 17, 2012, Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id., Finding No. 4.)

The ALJ found that **prior to February 18, 2014**, "the date the claimant became disabled", he had a residual functional capacity ("RFC") to perform medium work as defined in the regulations

> except he was able to perform all postural activities only frequently. There should have been no concentrated exposure to extremes of temperature, vibrations, dusts, fumes, gases, poor ventilations, noxious odors, or other lung irritants. Interactions with members of the general public should have been on a brief and incidental basis only. Such a person was also limited to no more than occasional decision making or changes in the work setting. (Tr. at 18, Finding No. 5.)

The ALJ then found that **beginning on February 18, 2014**, Claimant had an RFC to perform medium work

> except he was able to perform all postural activities only frequently. There should have been no concentrated exposure to extremes of temperature, vibrations, dusts, fumes, gases, poor ventilations, noxious odors, or other lung irritants. Interactions with members of the general public should have been on a brief and incidental basis only. Such a person was also limited to no more than occasional decision making or changes in the work setting. Such a person would also have been expected to be absent on the average of two to three days a month. (Tr. at 22, Finding No. 6.)

6

At step four, the ALJ found that **since February 17, 2012**, Claimant was incapable of performing past relevant work. (Tr. at 23, Finding No. 7.) At step five of the analysis, the ALJ found that prior to the established disability onset date [February 18, 2014], Claimant was an individual of advanced age. (Id., Finding No. 8.) The ALJ found that Claimant had at least a high school education, and could communicate in English. (Id., Finding No. 9.) Employing the Medical-Vocational Rules as a framework, the ALJ determined that Claimant was not disabled **prior to February 18, 2014**, that transferability of job skills was immaterial to the determination of disability, as Claimant's age, education, work experience, and residual functional capacity indicated that there were other jobs existing in significant numbers in the national economy that Claimant could perform (Id., Finding Nos. 10 and 11.); however, **beginning on February 18, 2014**, the ALJ found that Claimant had not been able to transfer job skills to other occupations, as considering his age, education, work experience, and residual functional capacity, no jobs existed in significant numbers in the national economy that Claimant could have performed. (Id., Finding No. 10; Tr. at 24, Finding No. 12.)

On this basis, the ALJ found Claimant was not disabled prior to February 18, 2014, but became disabled on that date and was disabled through August 7, 2014, the date of his death. (Tr. at 25, Finding No. 13.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be

> somewhat less than a preponderance. If there is evidence to justify a refusal to direct
> a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d

640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving

conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the

Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize

the record as a whole to determine whether the conclusions reached are rational." Oppenheim v.

Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is not supported

by substantial evidence.

Issue on Appeal

This appeal concerns whether the ALJ's determination of the "established disability onset

date" of February 18, 2014 was arbitrary, which Mrs. Looney also states effectively eliminated

any disbursement of a retroactive award to her under the five-month waiting period. (Document

No. 8.) The undersigned considered all evidence of record pertaining to the arguments concerning

the ALJ's determination of Claimant's established disability onset date and discusses it below.

Claimant's Background

He was born on April 18, 1956, making him 55 years old on the alleged onset date, defined

as a "person of advanced age" by the Regulations. (Tr. at 23.); See 20 C.F.R. § 404.1563(e);

Claimant had at least a high school education, having obtained his GED in 1998. (Tr. at 189.) His

work history includes employment as a cable installer, a technician, and a technical agent. (Id.)

During the pendency of this proceeding, Claimant died on August 7, 2014 (Tr. at 430.) and his

widow, Mrs. Looney, was substituted as a party in interest. (Tr. at 118-120, 146.)

8

The Relevant Evidence of Record

Claimant's Statements in SSA Disability Forms:

After filing his application for benefits, Claimant completed and submitted as evidence two Adult Function Reports and a Pain Questionnaire. (Tr. at 196-203, 212-216, 217-224.) In the first Adult Function Report, dated March 28, 2013, Claimant described having trouble talking to people as well as experiencing constant anxiety, irritability, racing thoughts, loss of memory, and difficulty concentrating. (Tr. at 196.) Claimant admitted to lashing out verbally, having internal anger, and not wanting to leave his house "even to go to [the] mailbox". (Id.) He described a typical day as lying down, watching television at night, taking a shower, and washing dishes or laundry. (Tr. at 197.) He explained that due to his impairments, he was no longer able to "[t]hink straight, concentrate" or "[r]emember procedures at work". (Id.) He stated he "cycle[d] through periods of sleeping and not sleeping" sometimes for up to seven to ten days at a time. (Id.) He admitted to rationing his insulin "because of cost". (Tr. at 198, 316.) At that time, Claimant indicated he could fix simple meals for himself, do some housework, and mow and trim the yard but sometimes would require help from his wife when "incapacitated due to my illness". (Id.) Claimant stated he went outside and to the grocery store, but only if his wife were with him. (Tr. at 199.) He stated he could not pay bills due to anxiety and poor judgment in handling money. (Id.) Claimant stated he self-isolated, did not maintain friendships, and did not speak to his siblings because of his history of verbally "cutting them down". (Tr. at 201.) He complained of stuttering due to anxiety, loss of memory and concentration, not getting along with others, and having a negative personality. (Id.) He stated he could sometimes pay attention for an hour and other times not at all and stated he could follow written instructions and made notes for himself with spoken instructions. (Id.) He

admitted he became "defiant" with supervisors if he thought they were wrong and could not handle stress due to anger and avoidance behaviors. (Tr. at 202.) Claimant indicated he had been wearing braces for his carpal tunnel syndrome flares for the past 20 years and also wore glasses. (Id.) He indicated his Gabapentin slowed his "brain activity" and interfered with his concentration. (Tr. at 203.)

In an updated Adult Function Report, dated May 6, 2013 (Tr. at 217-224), Claimant described a cycle of depression and mania that had been present for 2.5 years. (Tr. at 217.) He stated that during a depressive episode, he would do nothing but stare at the television; if in a manic episode, he completed housework and mowed the lawn. (Tr. at 218.) He stated that approximately every two months, he would "cycle through a phase where I don't sleep at all for 7-10 days." (Id.) He indicated his ability to pay attention depended on the state of his bipolar cycle and that he could follow written instructions, but would continually need to refer back to them. (Tr. at 222.) Claimant concluded: "I am suicidal most days." (Tr. at 224.)

In a Pain Questionnaire, also dated May 6, 2013 (Tr. at 212-216.), he reported physical pain in his feet as a result of diabetic neuropathy, which he described as a burning and stinging pain lasting 30 minutes to two hours each night. (Tr. at 212.) He indicated he took Gabapentin for this condition but experienced significant side effects, such as drowsiness. (Tr. at 213.)

Claimant's Physical Impairments:

A reference to Claimant's history of carpal tunnel syndrome was made in a psychiatric consultation report dated May 6, 2013 from Charleston Area Medical Center, when Claimant was briefly hospitalized for depression and suicidal ideation. (Tr. at 255.) Treatment notes from John P. MacCallum, M.D., Claimant's psychiatrist and primary provider mention Claimant's bilateral

carpal tunnel syndrome (Tr. at 302, 328.), although he primarily treated Claimant for his mental impairments and diabetic symptoms, peripheral neuropathy. (Tr. at 274-329, 366-383.) A treatment note dated December 2, 2013, Dr. MacCallum noted that Claimant reported symptoms of numbness in his right hand and fingers that radiated from his wrist. (Tr. at 377.) Claimant reported that he wore braces but thought his recent use of a hammer may have aggravated his condition. (Id.) On February 18, 2014, Claimant was evaluated by Clydena Broughton, APRN, FNP at St. Francis Hospital, and reported worsening carpal tunnel syndrome in his right wrist and diabetic neuropathy in his right foot; he denied injury. (Tr. at 357.) On examination, FNP Broughton noted Claimant had right wrist tenderness, positive Phalen's and Tinel's signs, as well as heel tenderness with palpation of the right foot. (Tr. at 363.) Claimant declined imaging and a referral to podiatry or an orthopedist stating he did not have insurance. (Id.) FNP Broughton referred Claimant to West Virginia Health Right and Dr. Clark Adkins, an orthopedist. (Tr. at 364.)

On March 26, 2014, Claimant went to Sherri Morgan, FNP to establish care for his carpal tunnel syndrome. (Tr. at 349.) Claimant stated that he had suffered from bilateral carpal tunnel syndrome for twenty years and had worn wrist braces to alleviate symptoms. (Id.) He described numbness and tingling of the tips of his fingers, and on examination, he was noted to have mild anxiety but normal exam findings. (Id.) FNP Morgan ordered an electromyography ("EMG") study of the upper extremities and indicated Claimant may need a referral to the surgery clinic. (Id.) An EMG report, dated April 7, 2014, confirmed Claimant had bilateral carpal tunnel syndrome, right greater than left, and mild abnormalities in the ulnar nerves bilaterally, possibly due to diabetic neuropathy. (Tr. at 428.)

State Agency Medical Consultant:

On April 19, 2013, at the initial level, Joyce Goldsmith, M.D. reviewed the file and opined Claimant's physical impairments were not severe. (Tr. at 65-69.) On May 21, 2013, at the reconsideration level, Atiya M. Lateef, M.D. reviewed the file and completed a physical residual functional capacity ("RFC") assessment. (Tr. at 82-85.) Dr. Lateef indicated Claimant's diabetes mellitus and peripheral neuropathy were severe medically determinable impairments (Tr. at 82.) that would limit him to medium work except he must avoid concentrated exposure to extreme cold, extreme heat, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards. (Tr. at 83-85.)

Claimant's Mental Impairments:

Claimant received regular psychiatric care for bipolar disorder and anxiety disorder from John P. MacCallum, M.D. beginning in November 2011[5] with the last treatment note dated May 22, 2014. (Tr. at 274-331, 366-383.) Claimant admitted to thoughts of suicide and problems controlling himself and making good decisions. (Tr. at 277, 284, 293, 319, 321.) Despite Dr. MacCallum's attempts to treat and control Claimant's physical and mental conditions through a variety of prescribed medications and changes in dosages (Tr. at 276, 280, 282, 284, 286, 288, 290-291, 297.), Claimant experienced short periods of improvement (Tr. at 313, 325, 382.), before again reporting symptoms of increased anxiety and insomnia as well as decreased concentration, cycles of manic and depressive episodes, and recurring suicidal thoughts. (Tr. at 281, 285, 288, 292, 295, 307, 315, 319, 321, 327, 367, 374, 377.) For instance, he indicated feeling "not depressed anymore" on November 27, 2012 (Tr. at 313.) but by January 23, 2013, he was feeling more pressure and stress due to work issues (Tr. at 316.), and by February 13, 2013, he told Dr.

---

[5] The record provides that Claimant, prior to the alleged onset date, was also hospitalized at Highland Hospital for depression and suicidal thoughts on July 5, 2011 and discharged on July 9, 2011. The discharge summary indicated that Claimant had a previous history of an overdose in 2002. (Tr. at 262-264.)

MacCallum that he had "been crying a lot the last few days and having suicidal thoughts again" and feeling "desperate". (Tr. at 319.) Eventually, by March 25, 2014, Dr. MacCallum confirmed Claimant was unable to take antidepressants but noted that Neurontin might help to stabilize his mood. (Tr. at 380.)

Charleston Area Medical Center:

On May 6, 2013, Claimant presented to the emergency room due to worsening depression and suicidal ideation that persisted for two days; he admitted to having suicidal thoughts "all the time with several plans such as overdosing or running his car in his garage". (Tr. at 249.) The records indicated that Claimant attempted suicide by overdosing in 2006, again in 2011, and by inhaling vehicle exhaust in 2012. (Tr. at 251.) Claimant left the hospital against medical advice on May 7, 2013. (Tr. at 257.)

State Agency Psychological Examiner:

On August 13, 2013, Kay Collins-Ballina, M.A. conducted a psychological consultative examination at the request of the State agency. (Tr. at 331-335.) Claimant explained that he was depressed and had "a lot of social anxiety." (Tr. at 331.) He described not wanting to go outside for fear his neighbors would talk to him. (Id.) Claimant reported difficulties with sleep, feeling "heavy," being hypomanic, having memory and appetite loss, crying all the time, and waking feeling very anxious. (Tr. at 332.) He admitted to suicidal thoughts about every two months, which were made worse with antidepressants, such as Paxil and Prozac. (Tr. at 332-333.) He had been prescribed Neurontin, 2,800 mg per day and Abilify, which he stated made him feel like a "zombie" and he "went berserk." (Tr. at 333.) Claimant explained that during his manic episodes, he felt like mowing and cleaning. (Id.) He stated he had not maintained friendships, and would

13

talk to his neighbors if they approached him, but would not initiate conversation. (Id.)

During the mental status examination, Claimant was neatly dressed and groomed and appeared to be his stated age. (Tr. at 334.) His speech was relevant and coherent, and he was oriented times four. (Id.) Claimant's observed mood was sullen with a broad affect. (Id.) His psychomotor behavior, judgment, and insight appeared to be within normal limits. (Id.) His immediate memory and delayed memory were noted to be mildly deficient based on word recall, but his remote memory and attention, concentration, persistence and pace were all within normal limits. (Id.) Ms. Collins-Ballina's diagnostic impressions included unspecified bipolar disorder and unspecified anxiety disorder. (Id.)

State Agency Psychological Consultant:

On April 19, 2013, Jane Cormier, Ph.D. reviewed the file and completed a Psychiatric Review Technique assessment and a Mental Residual Functional Capacity Assessment at the request of the State agency. (Tr. at 69-73.) Dr. Cormier indicated Claimant's anxiety disorder and affective disorder were severe impairments that resulted in a mild restriction of activities of daily living and moderate difficulties in social functioning and maintaining concentration, persistence, or pace. (Tr. at 69.) Dr. Cormier found Claimant had no repeated episodes of decompensation. (Id.) Dr. Cormier concluded that the evidence of record supported a finding that Claimant would be moderately limited in his ability (1) to maintain attention and concentration for extended periods; (2) to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (3) to accept instructions and respond appropriate to criticism from supervisors; and (4) to respond appropriately to changes in the work setting. (Tr. at 71-73.)

Dr. Cormier further explained Claimant may have difficulty with sustained attention and concentration and may experience occasional interference during the workday or workweek due to his psychologically-based symptoms. (Tr. at 72.) Additionally, Dr. Cormier indicated Claimant may have some difficult accepting direction and criticism and may have difficulty coping appropriately with many changes in a work setting. (Tr. at 72-73.) Dr. Cormier concluded Claimant had the capacity to understand and recall simple and detailed tasks, complete tasks if motivated, appropriately interact with the public and coworkers, recognize and respond to most hazards and make plans independently, and perform routine, repetitive tasks on a sustained and independent bases as motivated. (Tr. at 73.)

On September 11, 2013, John Todd, Ph.D. reviewed the file for the State agency at the reconsideration level, opined Claimant's mental impairments were not severe, but ostensibly adopted Dr. Cormier's opinion as written. (Tr. at 82-83, 85-87.)

<u>The Administrative Hearing</u>

<u>Mrs. Looney Testimony:</u>

Mrs. Looney testified she had been married to Claimant for 28 years, and looking back, she could see that her husband had always struggled with depression and obsessive behaviors. (Tr. at 43.) She stated that in 2005, Claimant suddenly began thinking no one loved him and that he was alone, despite being really close to his family, and spending every weekend together and holidays. (Tr. at 44.) Mrs. Looney explained that, thereafter, Claimant's extended family suddenly was no longer in their lives. (<u>Id</u>.)

Mrs. Looney testified Claimant died on August 7, 2014 after being hospitalized and intubated. (Tr. at 39-40.) She indicated his brain scan showed very little brain function, and he was

removed from the respirator. (Tr. at 40.) Mrs. Looney stated her husband had attempted suicide several times in the past; however, it was unclear whether this was a suicide attempt or a result of his sugar level spiking to 14. (Id.) Mrs. Looney explained Claimant had a tendency to overmedicate himself in an attempt to control his mental health issues. (Tr. at 45.)  She stated Claimant would take additional Xanax beyond that prescribed during manic episodes. (Id.)

Mrs. Looney testified that in the last two years of working at Prestera, Claimant's responsibilities had increased. (Tr. at 46.) She explained this increased his stress levels and that his job at Prestera probably lasted as long as it did because it was a mental health center. (Tr. at 46-47.) Mrs. Looney testified her husband was on leave through the Family Medical Leave Act for his mental disabilities. (Tr. at 41.) She stated he had taken several months of vacation and sick time because he could not function, and when working, he could not remember the names of people he had worked with for 20 years. (Id.) Mrs. Looney stated Claimant's supervisor would call her to pick up her husband because the supervisor was afraid to allow him to drive his car. (Id.) Mrs. Looney explained that while in a manic state, Claimant resigned from Prestera and later tried to rescind his resignation, but it was not accepted. (Tr. at 42.)

Mrs. Looney stated Claimant attempted to work again, this time at a customer service call center. (Tr. at 42-43). She explained he could not handle this work either and would come home "practically in tears" because he would be told to get off the telephone by supervisors while he was trying to help customers. (Tr. at 43.) She stated the human resources department was supposed to help by talking to his manager, but nothing changed. (Id.)

In regards to his behavior at home, Mrs. Looney described witnessing Claimant being depressed, staying in his room, and not interacting with anyone, even his daughters and friends.

16

(Tr. at 41.) Claimant began selling things that he loved, including his motorcycle and guitars. (Id.) Mrs. Looney stated her husband experienced manic episodes that were noticeable to others, and her youngest daughter had called her to come home from work to be with him. (Tr. at 47-48.) Mrs. Looney eventually began to work from home. (Tr. at 48.) She stated Claimant was not eating regularly and did not bathe during his manic episodes. (Tr. at 48-49.) She stated Claimant had stopped spending time with friends but would check on his elderly father occasionally. (Tr. at 49.) Mrs. Looney described her husband as being irritable, especially with their children, and he would lose his temper over anything. (Id.) She indicated both daughters had moved out of the home because of him. (Tr. at 49-50.)

Mrs. Looney testified Claimant was taking his insulin regularly. (Tr. at 50.) She stated he would try to help with some household chores, such as cleaning the dishes and vacuuming, but had difficulty holding on to things due to his carpal tunnel syndrome and had broken several dishes. (Tr. at 50-51.) She indicated that while they had a computer, Claimant did not spend time on it, instead spending time watching television or "piddling in the yard," but would mostly worry and lie on the couch in the dark. (Tr. at 51.) She stated that although Claimant had been able to fix anything in the past, she recalled a more recent time when he had difficulty reassembling the carpet cleaner after removing pet hair and began crying. (Id.) She explained that "minor things that he used to be able to do, he was no longer able to do." (Tr. at 52.)

Mrs. Looney explained Claimant had applied for disability to get insurance so he could try to get better. (Id.) She stated Claimant had self-paid to see Dr. MacCallum, the medical doctor and a psychiatrist who prescribed all of his psychiatric medications. (Tr. at 52-53.) Mrs. Looney explained an employee assistance program through Prestera referred him to Process Strategies;

however, this did not help since the provider there continued to increase his dosage of Neurontin to the point Claimant could not even focus. (Tr. at 53, 56-57.)

Mrs. Looney testified that she had been told by the hospital during Claimant's psychiatric hospitalization at Charleston General and Highland that he was under a mental health warrant for 72 hours. (Tr. at 53.) However, the hospital released Claimant without notifying her or explaining why he was being discharged even though he had just held a gun to his head and tried to kill himself. (Tr. at 53-54.) Mrs. Looney stated she wanted her husband to remain in the hospital to receive help. (Tr. at 54.)

Mrs. Looney stated her husband had looked for other types of work, but his neuropathy and carpal tunnel syndrome were worsening. (Id.) She stated he was unable to perform manual work and also could not deal with people. (Id.) She indicated Health Right had stated they would help Claimant with his carpal tunnel syndrome, but then a month prior to his death, they would not perform the surgery unless he was "selected" as a charity case. (Tr. at 55, 58.)

Nancy Shapero, Vocational Expert:

The ALJ informed the VE that he found Claimant's customer service representative position to be an unsuccessful work attempt. (Tr. at 59.) The VE identified Claimant's other work position as a technical support specialist (DOT No. 033.162-018) at the light, skilled (SVP 7) level. (Tr. at 60.) The ALJ asked the VE whether a hypothetical individual with Claimant's vocational profile and controlling RFC could perform his past work. (Id.) The VE testified Claimant's past work would be precluded, but named other work an individual could perform at the unskilled, medium level as a stock clerk (DOT No. 922.687-058), hand packer (DOT No. 920.587-018), or assembler (DOT No. 806.684-010) (Tr. at 60-61.) The VE further testified that an individual who

18

would be absent on average two to three days a month would be precluded from all work. (Tr. at 62.)

Mrs. Looney's Challenges to the Commissioner's Decision

The main argument concerns whether the ALJ arbitrarily chose Claimant's onset date which was unsupported by substantial evidence. (Document No. 8 at 14-20.) Mrs. Looney argues that an ALJ's choice of onset date must be a product of the medical evidence and "informed judgment", pursuant to SSR 83-20, and should an onset date be inferred, the Ruling dictates that the ALJ is obligated to consult with a medical advisor. (Id. at 15.) In this case, Mrs. Looney argues that the ALJ chose Claimant's onset date based on a medical record dated February 18, 2014, indicating that his carpal tunnel condition was exacerbated, but did so without the advice of a medical advisor which has been deemed arbitrary per Steele v. Astrue, 2009 WL 899424, at *11 (S.D.W.Va. March 31, 2009). (Id. at 16.) Further, Mrs. Looney argues that the only addition to the ALJ's RFC assessment in finding him disabled after February 18, 2014 is that he would be expected to be absent two to three times per month, but he did not explain if it was Claimant's carpal tunnel syndrome or his mental impairments that provided the evidentiary support for this disabling RFC. (Id. at 17.) As a result, Mrs. Looney claims this arbitrarily chosen onset date is the product of an "uneducated guess" that is prohibited under SSR 83-20 and Bailey v. Chater, 68 F.3d 75, 80 (4th Cir. 1995). (Id.) Mrs. Looney also contends that the ALJ's own statements on the record that Claimant's carpal tunnel syndrome would have limited him to at least light work[6] was not reflected in his RFC assessment, as it remained at medium level. (Id. at 18.) Moreover, the ALJ gave significant weight to the physical RFC assessment provided by Dr. Lateef, however, she did

---

[6] Tr. at 61.

not consider Claimant's carpal tunnel syndrome, therefore, once again, the ALJ's RFC does not explain what evidence supported it, and did not include any limitations that would relate to Claimant's exacerbated carpal tunnel syndrome. (<u>Id</u>.)

Mrs. Looney also argues that the ALJ's own statement that Claimant's carpal tunnel syndrome reduced him to light exertional level would have resulted in a finding that he was disabled as of his alleged onset date pursuant to the Medical-Vocational Rule 202.06. (<u>Id</u>. at 19.) Therefore, the ALJ's arbitrary choice of onset date is not harmless. (<u>Id</u>.) There is a question as to whether the ALJ chose the onset date in his decision as a means to avoid any payment to Mrs. Looney, when the record showed numerous instances of Claimant's mental instability that would have also supported a finding of disabled as of the alleged onset date, which was also supported by Dr. Comier's opinion that Claimant would have missed work two to three times per month as a result of his mental impairments. (<u>Id</u>.) Mrs. Looney asks the ALJ's decision be reversed and remanded. (Tr. at 20.)

The Commissioner responds that the ALJ appropriately relied upon the medical evidence that showed Claimant's carpal tunnel syndrome and mental impairments were managed prior to February 2014, but became worse afterwards, thus, the established onset date of disability is supported by substantial evidence. (Document No. 9.) The Commissioner argues that SSR 83-20 and <u>Bailey v. Chater</u>, 68 F.3d at 79-70 provide that when medical evidence documents a claimant's progression towards disability, as is the case here, then an ALJ need not consult a medical advisor. (<u>Id</u>. at 6-8.) Further, the Commissioner points out that the ALJ's discussion of the medical evidence indicated that Claimant was treated conservatively prior to February 2014, which did not support a finding of disability prior to that date. (<u>Id</u>. at 9-11.) The Commissioner further contends that Mrs.

Looney's reliance on the carpal tunnel diagnosis is not sufficient for a finding of disability[7] prior to February 18, 2014, as Claimant had reported to his treating physician that he suffered from the condition for "twenty years" and wore braces to alleviate his symptoms, but only after February 18, 2014 did the medical evidence indicate that his carpal tunnel syndrome become disabling. (Id. at 13.) Moreover, the Commissioner states that Claimant's mental impairments were not disabling prior to February 2014, as the medical evidence, specifically the opinions provided by State agency consultants, had clearly shown otherwise. (Id. at 14-15.)

The Commissioner also argues that Mrs. Looney's allegation that the ALJ was somehow biased against her receiving her husband's benefits is without merit; the decision is supported by substantial evidence and should be affirmed. (Id. at 16.)

In reply, Mrs. Looney contends that the ALJ's established onset date is arbitrary and her argument is supported by this Court's decision in Steele v. Astrue, at *11: remand was appropriate where an ALJ established the onset date as of the date a chronic condition was exacerbated without consulting a medical advisor. (Document No. 10 at 2.) Further, Mrs. Looney argues that the ALJ's RFC assessment does not take into consideration Claimant's carpal tunnel syndrome, and did not explain what medical condition would have caused his absenteeism from work; Mrs. Looney testified that Claimant's mental impairment was the cause for this, not his carpal tunnel syndrome, and her appeal is that Claimant's mental impairments were disabling prior to February 2014. (Id. at 3.) This omission is reversible error, akin to the situation found in Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016), which held an ALJ must provide a "logical bridge" from the evidence to the conclusions. (Id. at 4.) Because of the ALJ's errors, Claimant concludes that the decision is not

---

[7] Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986).

supported by substantial evidence, and remand is necessary. (<u>Id</u>. at 5.)

Analysis

The issue presented in this case is whether the ALJ's establishing the onset date of February

18, 2014 was arbitrary and should be reversed and remanded.

In <u>Bailey v. Chater</u>, 68 F.3d 75, 79 (4th Cir. 1995), the Fourth Circuit, citing SSR 83–20,

found:

> The Ruling's language does not expressly mandate that the ALJ consult a medical advisor in every case where the onset of disability must be inferred. Nevertheless, if the evidence of onset is ambiguous, the ALJ must procure the assistance of a medical advisor in order to render the informed judgment that the Ruling requires. <u>Spellman v. Shalala</u>, 1 F.3d 357, 362–63 (5th Cir. 1993); <u>Morgan v. Sullivan</u>, 945 F.2d 1079, 1082–83 (9th Cir. 1991); <u>see</u> <u>Blankenship v. Bowen</u>, 874 F.2d 1116, 1124 (6th Cir. 1989); <u>but see</u> <u>Pugh v. Bowen</u>, 870 F.2d 1271, 1278 n. 9 (7th Cir. 1989) (medical advisor was unnecessary where the ALJ had a complete medical chronology of the claimant's condition throughout the relevant time period).

In <u>Bailey</u>, the Court concluded that "[i]n the absence of clear evidence demonstrating the

progression of [claimant's] condition, the ALJ did not have the discretion to forgo consultation

with a medical advisor." <u>Id</u>. The Court stated that "[t]he requirement that, in all but the most plain

cases, a medical advisor be consulted prior to inferring an onset date is merely a variation on the

most pervasive theme in administrative law – that substantial evidence support an agency's

decisions." <u>Id</u>. at 80. (citations omitted).

The ALJ's Recitation of the Evidence Prior to February 18, 2014:

The ALJ noted that in terms of Claimant's severe impairments prior to February 18, 2014,

Claimant had been treated by Dr. MacCallum for bipolar disorder, diabetes, and anxiety disorder,

NOS. (Tr. at 19.) The ALJ noted the medical record documented Claimant reporting that he quit

his job on February 23, 2012 and he "did not know what he was doing". (<u>Id</u>.) However, after a

22

couple of months, by April 17, 2012, Claimant "reported that his anger was dissipating and he was becoming more balanced". (Id.) It was further noted that Claimant was working for Cabellas and "was thankful for the work". (Tr. at 19-20.) Because his wife's Xanax helped him, Dr. MacCallum wrote Claimant a prescription for Xanax. (Tr. at 20.) Claimant's mental impairments were reportedly stable until May 6, 2013 when he reported to the Charleston Area Medical Center for suicidal ideation, however, he left the following day against medical advice. (Id.) On August 27, 2013, consultative examiner Ms. Kay Collins-Ballina evaluated Claimant and opined his prognosis was good with treatment and intervention. (Tr. at 20, 21.) A treatment note dated September 4, 2013 from the Center for Alternative Medicine indicated Claimant was doing physically well, although feelings of depression and mania persisted for which he received medication refills. (Tr. at 20.)

From the aforementioned, the ALJ found Claimant was treated conservatively and from a psychiatric standpoint, his symptoms had improved when he was compliant with medication. (Tr. at 20-21.) The ALJ gave significant weight to the State agency psychological consultants' opinions based on their program knowledge and detailed explanations, and further, the ALJ found their findings overall consistent with the examination report by Ms. Collins-Ballina. (Tr. at 21.)

With regard to his physical impairments, the ALJ gave significant weight to Dr. Lateef's opinion, although he found Claimant was able to perform all postural activities only frequently and should have no concentrated exposure to extremes of temperature, vibrations, dusts, fumes, gases, poor ventilations, noxious odors, or other lung irritants. (Id.) Prior to February 18, 2014, the ALJ found Claimant had the RFC to perform the full range of medium work. (Tr. at 24.)

The ALJ's Recitation of the Evidence After February 18, 2014:

23

Regarding Claimant's physical impairments, the ALJ noted that a record dated March 26, 2014 from West Virginia Health Right indicated that Claimant presented for treatment of carpal tunnel syndrome. (Tr. at 22.) Claimant reported tingling and numbness of the fingertips. (Id.) A record dated February 18, 2014 from St. Francis Hospital provided evidence of positive Phalen's and Tinel's testing as well as diabetic neuropathy with pain of the right heel. (Id.) The ALJ further noted a record dated April 7, 2014 confirmed bilateral carpal tunnel syndrome, right worse than left. (Id.)

Regarding mental impairments, records from Charleston Area Medical Center on July 24, 2014 showed that Claimant had accidently overdosed on Xanax; he was administered Narcan and discharged per his request. (Id.) On July 27, 2014, Claimant returned to the emergency room, unresponsive, and it was unknown if he had overdosed on medications, if it was due to excessive sugar levels, or if something else caused his respiratory failure and altered mental state. (Tr. at 22-23.) Subsequently, Claimant was discharged to Hubbard Hospice House where he passed away on August 7, 2014. (Tr. at 23.)

There is no dispute that the ALJ provided the "established onset date" of February 18, 2014 as a result of Claimant's physical impairments: that is the date when Claimant presented to the emergency department at St. Francis Hospital due to exacerbation of his chronic pain in his right wrist and right foot, due to carpal tunnel syndrome and diabetic neuropathy. (Tr. at 357-364.) At the time, Claimant's psychological findings were that he had a normal mood and affect, and oriented x3. (Tr. at 363.) There is no dispute that Claimant had been treated for several years for his bipolar, anxiety and depressions disorders by Dr. MacCallum. A report dated July 10, 2013 indicated that Claimant stated "he would not attempt suicide again because of the pain it would

cause his family and friends". (Tr. at 367.) Another report dated September 4, 2013 noted that Claimant reported that "early August he was depressed in the morning and would be 'manic' in the afternoons. This lasted approx. 2 weeks. He states "'I have been 'manic' most of the summer'"". (Tr. at 374.) By December 2, 2013, Claimant reported having increased anxiety and crying spells, feeling overwhelmed and "feel[ing] like running away from home, feel[ing] like a huge burden on my family". (Tr. at 378.) Dr. MacCallum had a "discussion regarding [Claimant's] 'suicidal thoughts'". (Id.)

Claimant's final hospital admission was on July 27, 2014. (Tr. at 384-417.) Of interest here, the reports indicated suspected drug overdose due to his previous admission for same (Tr. at 418-427.) as well as his histories of depression, polysubstance overdose, suicidal ideations, mood disorder and suicidal gestures. (Tr. at 384, 386, 388, 390, 391, 393, 394, 395, 399, 400, 403, 416.) The discharge diagnoses were acute respiratory failure secondary to drug overdose; anoxic brain damage, suicide attempt, and drug overdose. (Tr. at 402.) The EEG report was abnormal due to "toxic metabolic encephalopathy or medication affect". (Tr. at 417.)

The death certificate submitted to the record has no cause of death listed, and is instead described as "pending" due to the ongoing investigation at the time. (Tr. at 430.)

Mrs. Looney has argued that the ALJ's established onset date is arbitrary, particularly with respect to Claimant's mental impairment history, and the records suggest that this argument has merit. There has been no evidence suggesting that Claimant died from his physical impairments; Claimant's final diagnoses after being discharged to hospice in addition to the "pending" cause of his death strongly suggests that his mental impairments were the primary cause. Further, the medical evidence consistently indicated that Claimant suffered from chronic symptoms associated

with anxiety, depression, and bipolar disorder before the established onset date of February 18, 2014, as well as afterwards. Indeed, the record supports that Claimant had sought help for his suicidal ideation on May 6, 2013 when he presented to Charleston Area Medical Center. (Tr. at 253.) Though his physical impairments appeared to be under control, he continued to suffer from symptoms related to depression and suicidal ideation on December 2, 2013. (Tr. at 378.) As early as February 23, 2012, Claimant reported to his primary care physician that had just quit his job at Prestera, was angry with himself about that, and stated that "he does not even know who he is anymore, that he must be insane". (Tr. at 293.) In short, this case is far from the "most plain of cases"[8] where an onset date can be inferred without the consult of a medical advisor, particularly with regard to Claimant's mental impairments, of which the record supports were the gravamen of Claimant's severe impairments, and the primary reason for becoming unemployed and seeking disability.

In addition, the undersigned agrees with Mrs. Looney's argument that the ALJ's RFC assessment beginning on February 18, 2014 does not specify whether Claimant's mental or physical impairments would have caused his absenteeism from work, thus depriving the Court from meaningful review of the conclusions. Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015). Though the established onset date indicates that the ALJ probably referred to Claimant's physical impairment, carpal tunnel syndrome, as the cause of his absenteeism, such *post hoc* rationale would be inappropriate. See v. Washington Metro. Area Transit Auth., 36 F.3d 375, 384 (4th Cir. 1994) (part of the ALJ's "duty of explanation" requires specific references to the evidence supporting a particular finding). Accordingly, in the jurisprudence of Steele v. Astrue, the undersigned finds

---

[8] Bailey v. Chater, at 80.

that the ALJ's decision to award benefits as of February 18, 2014, the date of his exacerbated physical impairment only, without the opinion of a medical advisor, was arbitrary.[9]

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **GRANT** the Claimant's Motion for Judgment on the Pleadings (Document No. 8.), **DENY** the Defendant's Motion for Judgment on the Pleadings (Document No. 9.), **REVERSE** the final decision of the Commissioner, and **REMAND** this matter back to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further administrative proceedings in order to consult with a medical advisor regarding Claimant's onset date.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.

---

[9] The undersigned does not address Mrs. Looney's implication that the ALJ was somehow biased against her receiving her deceased husband's benefits by establishing an onset date two years beyond the alleged onset date, as there has been no evidence established to substantiate such a claim and further, the main issue on appeal concerned the established onset date.

Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Copenhaver, and this Magistrate Judge.

The Clerk of this court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: November 9, 2016.

Omar J. Aboulhosn
United States Magistrate Judge

28